ZACHARY M. BRIERS (SBN 287984)
zachary.briers@mto.com
ERIN J. COX (SBN 267954)
erin.cox@mto.com
ADAM W. KWON (SBN 327932)
adam.kwon@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
Fax:             (213) 687-3702

*Attorneys for Defendant*
*Last Brand, Inc. d/b/a Quince.com*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| QUINCE & CO LLC, | Case No. 3:23-cv-06016-AMO |
| *Plaintiff,* | Hon. Araceli Martínez-Olguín |
| v. | **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; DEFENDANT'S MOTION TO STRIKE DECLARATION OF DANIEL PAGE** |
| LAST BRAND, INC., | |
| *Defendant.* | |
| | Date: March 21, 2024 |
| | Time: 2:00 P.M. |
| | Courtroom: 10 |
| | **[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................. 1

II.   FACTUAL BACKGROUND .............................................................................. 3

    A.    Quince.com Is a Highly Acclaimed Apparel and Accessories Retailer................... 3

    B.    Quince.com Adopted the Name "Quince" to Evoke "Quintessential" Products..................................................................................................... 3

    C.    Quince.com and Plaintiff Do Not Have Overlapping Products or Customers.......... 4

    D.    FedEx Inadvertently Forwarded Packages to Plaintiff's Location.......................... 5

    E.    The Six Errant Reviews Identified by Plaintiff Were Promptly Removed.............. 5

    F.    Quince.com Applied for a Trademark, Which Was Preliminarily Approved........... 5

    G.    Shortly Before Filing Suit, Plaintiff Purchased the '261 Registration. ................... 6

    H.    Shortly Before Filing Suit, Plaintiff Redesigned Its Logo...................................... 6

    I.    Plaintiff Offered to License the Name "Quince" to Defendant for $12 Million, Then Filed this Case When Defendant Refused. ...................................... 7

III.  ARGUMENT ....................................................................................................... 7

    A.    Plaintiff Has Not Established It Is Likely to Succeed on the Merits. ....................... 8

        1.    Plaintiff Has Not Established That It Has a Protectable Trademark............. 8

            (a)    Plaintiff's Mark Is Descriptive, and Plaintiff Has Not Even Attempted to Show It Has Acquired Secondary Meaning................ 8

            (b)    Plaintiff Did Not Acquire Any Right in the '261 Registration. ......................................................................... 10

        2.    Plaintiff Has Not Established a Likelihood of Consumer Confusion. ........ 10

            (a)    Unrebutted Survey Evidence Shows No Confusion....................... 11

            (b)    Strength of the Mark: Plaintiff's Mark Is Merely Descriptive......... 12

            (c)    Proximity of Goods: The Parties' Goods and Services Are Distinct. ................................................................................... 13

            (d)    Similarity of the Marks: The Marks' Similarity Stems From Plaintiff's Copying the Appearance of Quince.com's Logo........... 15

(e)    Evidence of Actual Confusion: Plaintiff's De Minimis Evidence of Confusion Does Not Show Actionable Source Confusion, and Is Outweighed by Defendant's Unrebutted Survey. ........................................................................ 16

(f)    Marketing Channels Used: There Is No Overlap in Marketing. ........................................................................ 19

(g)    Degree of Care: The Relevant Consumers Are Discerning. ........... 20

(h)    Intent: Defendant Had No Intent to Copy or Deceive. ................... 21

(i)    Likelihood of Expansion: There Is No Risk of Expansion. ............ 22

B.    Plaintiff Will Not Suffer Irreparable Harm Without a Preliminary Injunction. ........................................................................ 22

1.    The Purported Confusion Plaintiff Identified Does Not Demonstrate Irreparable Harm and Already Has Been Remedied. ................................ 23

2.    Plaintiff's Long Delay Demonstrates Lack of Irreparable Harm................ 24

3.    Any Harm Claimed by Plaintiff Is Compensable in Monetary Damages. ........................................................................ 26

C.    The Balance of Equities Weighs Strongly Against Issuing a Preliminary Injunction, Which Would Effectively Shut Down Defendant's Business. ............. 27

D.    Plaintiff's Proposed Injunction Would Imperil Hundreds of Jobs and Third-Party Businesses, Harming the Public Interest. ....................................................... 28

E.    A Bond Must Reflect the Significant Costs—Surpassing $200 Million—That Would Be Inflicted on Defendant by a Preliminary Injunction. .................... 29

IV.    MOTION TO STRIKE PAGE DECLARATION ............................................................ 30

V.    CONCLUSION ............................................................................ 30

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
   722 F.3d 1229 (10th Cir. 2013) ........................................................................ 17

*20th Century Wear, Inc. v. Sanmark-Stardust Inc.*,
   747 F.2d 81 (2d Cir. 1984) ................................................................................ 9

*Airs Fragrance Prods., Inc. v. Clover Gifts, Inc.*,
   395 F. App'x 482 (9th Cir. 2010) ..................................................................... 10

*Allstate Ins. Co. v. Allstate Inv. Corp.*,
   210 F. Supp. 25 (W.D. La. 1962) ..................................................................... 17

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ..................................................... 11, 13, 22, 24

*Amica Mut. Ins. Co. v. R. H. Cosmetics Corp.*,
   204 U.S.P.Q. 155 (T.T.A.B. 1979) ................................................................... 17

*Archive Corp. v. Cipher Data Prods., Inc.*,
   1988 WL 168533 (C.D. Cal. Dec. 21, 1988) ................................................... 29

*Atturo Tire Corp. v. Max-Trac Tire Co.*,
   2019 WL 1976446 (D. Nev. Mar. 7, 2019) ..................................................... 27

*Audio-Technica Corp. v. Music Tribe Com. My Sdn. Bhd.*,
   2022 WL 1423223 (C.D. Cal. May 5, 2022) ..................................................... 9

*B.D. Commc'ns, Inc. v. Dial Media, Inc.*,
   429 F. Supp. 1011 (S.D.N.Y. 1977) ................................................................. 17

*BBK Tobacco & Foods, LLP v. Cent. Coast Agric. Inc.*,
   615 F. Supp. 3d 982 (D. Ariz. 2022) ............................................................... 15

*Branding v. Lee Tillett, Inc.*,
   940 F. Supp. 2d 1178 (C.D. Cal. 2013) ........................................................... 26

*Brennan's, Inc. v. Brennan's Rest., LLC*,
   360 F.3d 125 (2d Cir. 2004) ....................................................................... 13, 14

*BrightView Landscapes, LLC v. Stowell*,
   2017 WL 10511569 (C.D. Cal. Dec. 11, 2017) ................................................ 24

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*,
   753 F.2d 14 (2d Cir. 1985) ............................................................................... 18

*Cairns v. Franklin Mint Co.*,
   24 F. Supp. 2d 1013 (N.D. Cal. 1998) ................................................... 2, 11, 16

*Cal. Cooler, Inc. v. Loretto Winery, Ltd.*,
 774 F.2d 1451 (9th Cir. 1985) ........................................................................................... 9

*Caribbean Marine Servs. Co. v. Baldrige*,
 844 F.2d 668 (9th Cir. 1988) ............................................................................................ 29

*Cazet v. Epps*,
 2010 WL 2474382 (N.D. Cal. June 11, 2010) .................................................................. 10

*Champion-Cain v. MacDonald*,
 2015 WL 4393303 (S.D. Cal. July 15, 2015) .................................................................... 28

*Coach Servs., Inc. v. Triumph Learning LLC*,
 668 F.3d 1356 (Fed. Cir. 2012) ......................................................................................... 16

*Cocina Cultura LLC v. Oregon*,
 2020 WL 7181584 (D. Or. Dec. 7, 2020) .......................................................................... 25

*Converse, Inc. v. Skechers U.S.A., Inc.*,
 909 F.3d 1110 (Fed. Cir. 2018) ...................................................................................... 9, 16

*Ctr. for Food Safety v. Schafer*,
 2010 WL 964017 (N.D. Cal. Mar. 16, 2010) .................................................................... 24

*Cuviello v. City of Vallejo*,
 944 F.3d 816 (9th Cir. 2019) .......................................................................................... 2, 24

*Dobson v. Crawford*,
 2023 WL 2347425 (C.D. Cal. Jan. 13, 2023) .................................................................... 25

*Duluth News-Trib. v. Mesabi Publ'g Co.*,
 84 F.3d 1093 (8th Cir. 1996) ........................................................................................17, 18

*Edgar v. MITE Corp.*,
 457 U.S. 624 (1982) ........................................................................................................... 30

*Entrepreneur Media, Inc. v. Smith*,
 279 F.3d 1135 (9th Cir. 2002) ........................................................................................... 13

*Escamilla v. Lara*,
 2023 WL 8114962 (C.D. Cal. July 7, 2023) ..................................................................... 25

*Essence Comm'ns, Inc. v. Singh Indus., Inc.*,
 703 F. Supp. 261 (S.D.N.Y. 1988) .................................................................................... 11

*Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*,
 2016 WL 4367990 (S.D.N.Y. Aug. 12, 2016) .............................................................. 8, 10

*Finjan, Inc. v. Blue Coat Sys., LLC*,
 2016 WL 6873541 (N.D. Cal. Nov. 22, 2016) .................................................................. 27

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
 314 F.2d 149 (9th Cir. 1963) ............................................................................................. 22

*Future Fields, LLC v. Future Scouts,*
2021 WL 6104311 (C.D. Cal. Nov. 24, 2021) .......................................................................... 20

*Globaltranz Enters. LLC v. Pinnacle Logistics Grp. LLC,*
2022 WL 1122158 (D. Ariz. Apr. 14, 2022) ............................................................................ 25

*Globefill Inc. v. Elements Spirits, Inc.,*
2016 WL 8944644 (C.D. Cal. Sept. 20, 2016) ........................................................................ 18

*GOLO, LLC v. Goli Nutrition Inc.,*
2020 WL 5203601 (D. Del. Sept. 1, 2000) .............................................................................. 18

*Hard Rock Cafe Int'l USA, Inc. v. RockStar Hotels, Inc.,*
2018 WL 7825183 (S.D. Fla. June 13, 2018)........................................................................... 20

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.,*
736 F.3d 1239 (9th Cir. 2013) .................................................................................22, 23, 26

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,*
4 F.3d 819 (9th Cir. 1993).................................................................................................... 27

*JIPC Mgmt., Inc. v. Incredible Pizza Co., Inc.,*
2008 WL 11336396 (C.D. Cal. Aug. 26, 2008) ....................................................................... 21

*Kahala Franchising, LLC v. Real Faith, LLC,*
2022 WL 1605377 (C.D. Cal. May 20, 2022)........................................................................... 23

*Kellogg Co. v. Nat'l Biscuit Co.,*
305 U.S. 111 (1938)................................................................................................................ 8

*Kerr Corp. v. N. Am. Dental Wholesalers, Inc.,*
2011 WL 2269991 (C.D. Cal. June 9, 2011)............................................................................ 26

*King of the Mountain Sports, Inc. v. Chrysler Corp.,*
185 F.3d 1084 (10th Cir. 1999) ............................................................................................. 18

*Kiva Health Brands LLC v. Kiva Brands Inc.,*
402 F. Supp. 3d 877 (N.D. Cal. 2019) .............................................................................14, 28

*L.A. Mem'l Coliseum Comm'n v. NFL,*
634 F.2d 1197 (9th Cir. 1980) .............................................................................................. 26

*Levi Strauss & Co. v. Blue Bell, Inc.,*
778 F.2d 1352 (9th. Cir. 1985) (en banc)............................................................................... 18

*Manes v. City of Santa Ana,*
2023 WL 5504985 (C.D. Cal. July 12, 2023).......................................................................... 25

*Marks Org., Inc. v. Joles,*
784 F. Supp. 2d 322 (S.D.N.Y. 2011) ................................................................................... 26

*Marlinspike Hall LLC v. Bar Lab Concepts LLC,*
2023 WL 6847208 (S.D.N.Y. Oct. 17, 2023)......................................................................... 20

*Mead Johnson & Co. v. Abbott Lab'ys*,
201 F.3d 883 (7th Cir.) (Easterbrook, J.) ..............................................................29, 31

*Michaels v. Internet Entm't Grp., Inc.*,
5 F. Supp. 2d 823 (C.D. Cal. 1988) ...................................................................... 30

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
856 F.2d 1445 (9th Cir. 1988) .............................................................................. 12

*Mister Donut of Am., Inc. v. Mr. Donut, Inc.*,
418 F.2d 838 (9th Cir. 1969) ................................................................................ 10

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) .............................................................8, 19, 20, 22

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
44 F.4th 180 (3d Cir. 2022) .................................................................................. 22

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
269 F.3d 114 (2d Cir. 2001) .................................................................................. 18

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
143 F. Supp. 3d 947 (N.D. Cal. 2015) .................................................................. 21

*Nutri/System, Inc. v. Con-Stan Ind., Inc.*,
809 F.2d 601 (9th Cir. 1987) ......................................................................... passim

*Oakland Trib., Inc. v. Chron. Publ'g Co., Inc.*,
762 F.2d 1374 (9th Cir. 1985) .............................................................................. 23

*Ocean Garden, Inc. v. Marktrade Co.*,
953 F.2d 500 (9th Cir. 1991) ................................................................................ 26

*Official Airline Guides, Inc. v. Goss*,
6 F.3d 1385 (9th Cir. 1993) .................................................................................. 18

*Parks LLC v. Tyson Foods, Inc*,
863 F.3d 220 (3d Cir. 2017) ................................................................................... 9

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir. 1985) .............................................................................. 30

*PepsiCo, Inc. v. Grapette Co.*,
416 F.2d 285 (8th Cir. 1969) ................................................................................ 10

*Petro Stopping Ctrs., L.P. v. James River Petroleum*,
130 F.3d 88 (4th Cir. 1997) .................................................................................. 18

*Polaroid Corp. v. Polarad Elecs. Corp.*,
182 F. Supp. 350 (E.D.N.Y. 1960) ....................................................................... 17

*Revlon, Inc. v. Jerell, Inc.*,
713 F. Supp. 93 (S.D.N.Y. 1989)........................................................................... 16

*Rise Basketball Skill Dev., LLC v. K Mart Corp.*,
2017 WL 4865561 (N.D. Cal. Oct. 2017) .............................................................................. 19

*Scat Enters., Inc. v. FCA US LLC*,
2017 WL 5896182 (C.D. Cal. June 8, 2017) .......................................................................... 11

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*,
589 F.2d 1225 (3d Cir. 1978) ................................................................................................ 17

*Shaklee Corp. v. HarperCollins Publishers, LLC*,
2011 WL 13278220 (N.D. Cal. Feb. 1, 2011) ....................................................................... 10

*Sorenson v. WD-40 Co.*,
792 F.3d 712 (7th Cir. 2015) ................................................................................................. 20

*Sugar Busters LLC v. Brennan*,
177 F.3d 258 (5th Cir. 1999) ................................................................................................. 10

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) ............................................................................................19, 22

*Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*,
601 F.2d 1011 (9th Cir. 1979) ............................................................................................ 8, 12

*The Real USFL, LLC v. Fox Sports, Inc.*,
2022 WL 1134487 (C.D. Cal. Apr. 14, 2022) .......................................................24, 26, 28, 29

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
610 F.3d 1171 (9th Cir. 2010) ............................................................................................... 21

*U.S. Blind Stitch Mach. Corp. v. Union Special Mach. Co.*,
287 F. Supp. 468 (S.D.N.Y. 1968) ........................................................................................ 17

*Usrey v. Chen*,
2014 WL 12570232 (C.D. Cal. May 29, 2014) ..................................................................... 30

*UV RML NL Assets, LLC v. Coulter Ventures, LLC*,
2021 WL 5706870 (C.D. Cal. Oct. 22, 2021) ....................................................................... 26

*Vital Pharms., Inc. v. PhD Mktg., Inc.*,
2020 WL 6545995 (C.D. Cal. Nov. 6, 2020) .....................................................................23, 26

*Water Pik, Inc. v. Med-Sys., Inc.*,
726 F.3d 1136 (10th Cir. 2013) ............................................................................................. 18

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008).................................................................................................................1, 7, 31

*World Champ Tech LLC v. Peloton Interactive, Inc.*,
2024 WL 665181 (N.D. Cal. Feb. 16, 2024)......................................................................... 20

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*,
698 F.2d 786 (5th Cir. 1983) ................................................................................................... 9

**STATUTES**

15 U.S.C. § 1116(a) ................................................................................................................ 22

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 65(c) .............................................................................................................. 29

**SECONDARY AUTHORITIES**

McCarthy, J. Thomas,
*McCarthy on Trademarks & Unfair Competition* (Dec. 2023 Update) ............................ passim

## I.     INTRODUCTION

Plaintiff operates a single restaurant in Jackson Square, where it serves elaborate tasting menus to some of San Francisco's wealthiest residents. While it says that it *intends* to sell a "handmade chef knife" in the future, Plaintiff has never sold any consumer goods. In contrast, Defendant ("Quince.com") operates the website Quince.com, where it sells "essentials," including apparel and accessories with simple designs. Quince.com's best-selling products are cashmere sweaters that retail for $50. Its consumers are budget-focused online shoppers across the United States—only ▮ of visitors to Quince.com are from San Francisco. Although there is no overlap in the parties' businesses or customers, Plaintiff seeks a preliminary injunction that would entirely shutter Quince.com, imperiling its 326 employees and more than ▮ in annual sales.

The only similarity between Plaintiff and Defendant is their use of the name "Quince." But the parties are not unique in that fact—at least 117 businesses nationwide use the name "Quince," which has been federally registered as a trademark by more than 15 businesses in diverse industries, including health care services, building materials, data services, faucets, Christmas decorations, yarn, dresses, and more. These starkly different businesses must have distinct reasons for using the same name. Plaintiff, for instance, adopted the name "Quince" because it is an esoteric fruit served at its restaurant and recognized by only discerning gourmands. Defendant, by contrast, adopted the name "Quince" as shorthand for "quintessentials," evoking the company's simple clothing designs.

Plaintiff's request for a preliminary injunction fails at the outset because Plaintiff has not established that it owns an enforceable right in the name "Quince," which the Trademark Office already concluded is merely descriptive when applied to restaurant services. A "descriptive" mark is not entitled to legal protection unless the mark holder proves that it has acquired a "secondary meaning," but Plaintiff has not submitted *any* evidence of secondary meaning.

Even if Plaintiff established that it owned an enforceable trademark, its motion nonetheless fails to establish any of the four *Winter* factors necessary to obtain a preliminary injunction. Plaintiff is unlikely to succeed on the merits because it cannot prove a likelihood of consumer confusion. The parties' vastly different products, consumer bases, price points, and distribution channels each demonstrate why confusion is highly improbable. Plaintiff did not submit to the Court a consumer

survey, which is "the most persuasive evidence" in assessing a likelihood of confusion. *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041 (N.D. Cal. 1998). This failure results in an "inference that the results of such a survey would be unfavorable" to Plaintiff. *Id.* But the Court need not rely solely on that inference. Quince.com commissioned its own consumer survey, which was performed by an expert in trademark survey design. That survey found *zero* confusion, establishing that confusion is exceptionally unlikely.

Plaintiff also has not established it would suffer irreparable harm. The only purported harm Plaintiff identifies is six errant online reviews. But those *already* have been remedied. After Plaintiff characterized those reviews as creating "irreparable" harm, Quince.com promptly had them moved to its own profile. Plaintiff's delay in bringing this motion—nearly four years after the launch of Quince.com and 17 months after Plaintiff contends it first discovered alleged confusion—further "implies a lack of urgency and irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). And, Plaintiff already offered to grant a license to Quince.com, demanding $12 million, which (while exorbitant) demonstrates a concession that any harm is compensable in damages.

The balance of the equities and the public interest also tip sharply against the issuance of a preliminary injunction. The injunction Plaintiff seeks would end Defendant's current business, which operates exclusively on Quince.com. It would threaten hundreds of jobs of Quince.com's employees. It would cause Quince.com to lose hundreds of millions of dollars in annual revenue; require it to discard approximately ██████ in inventory; and effectively forfeit Quince.com's investment of more than ██████ in marketing its brand over nearly four years. These harms dramatically outweigh the minimal inconveniences Plaintiff identified—namely, several packages that FedEx inadvertently forwarded to its restaurant. While the inconvenience Plaintiff experienced from receiving those packages is regrettable, it was caused by a clerical error at FedEx—not consumer confusion—and FedEx already has provided an assurance that it has implemented new processes to ensure it does not forward such packages to Plaintiff in the future.

The Court should deny Plaintiff's motion. Rather than short-circuiting this dispute, the parties should be permitted to litigate their disagreement on the merits. If Plaintiff prevails, it can seek appropriate relief at the end of the case, tailored to any specific harms it is able to prove.

## II.    FACTUAL BACKGROUND

### A.    Quince.com Is a Highly Acclaimed Apparel and Accessories Retailer.

Since its launch in June 2020, Quince.com has become one of the most heralded e-commerce retailers. It was named by Business Insider and Forbes Magazine as one of the best digital brands of 2022, and its products have been recommended by dozens of news sources, including the New York Times, Wall Street Journal, Vogue, and Good Morning America. *See* Gupta Decl. ¶ 11, Ex. C.

Quince.com sells "high-quality essentials at a price within reach." The company primarily sells "essential" apparel and accessories with simple designs and minimal branding. The best-selling products on Quince.com are its cashmere sweaters, which sell for $50. *Id.* ¶ 10. Quince.com sells exclusively online and to U.S. consumers; it does not have any physical locations. *Id.* ¶ 7.

Over the past four years, more than ▮▮▮▮ consumers have purchased more than ▮▮ ▮▮▮ Quince.com products. Milligan Decl. ¶ 2. The company's success is attributable to its brand identity, which Quince.com has invested more than ▮▮▮▮ to market—and to great effect: Quince.com's gross sales in 2023 exceeded ▮▮▮▮. *Id.* ¶¶ 2–3. The company currently employs 326 individuals, including 162 in the United States. *Id.* ¶ 4.

### B.    Quince.com Adopted the Name "Quince" to Evoke "Quintessential" Products.

Quince.com's co-founders initially launched a "beta" version of the company in January 2019. Gupta Decl. ¶ 4. When the company emerged from "beta," it hired marketing firms to identify a company name that evoked the aesthetic of its "essential" products. *Id.* ¶ 5. The founders settled on the name "Quince." As they explained in an email dated June 30, 2020, they selected "Quince" because it is "a shortened version of quintessentials," which evokes the company's design aspirations. *Id.* ¶ 6, Ex. A. The founders "liked the name" because "it was functionally beautiful, forward-looking, elegant, unfettered, and concise. Just like the products we're selling." *Id.*

The founders did not intend to create any confusion with Plaintiff's restaurant, which caters to a very different clientele. *Id.* ¶ 7. In fact, at the time Quince.com launched, Plaintiff's restaurant was closed due to shelter-in-place orders. And, more recently, Plaintiff's restaurant underwent an eleven-month remodel, and did not reopen until November 28, 2023. Briers Decl. ¶ 4. Thus, for much of the time Quince.com has been in operation, Plaintiff's restaurant was not even operative.

**C.  Quince.com and Plaintiff Do Not Have Overlapping Products or Customers.**

Quince.com and Plaintiff do not currently sell any overlapping products. Quince.com primarily sells apparel, jewelry, and handbags, which account for more than ███ of its total sales. Milligan Decl. ¶ 5. In addition, Quince.com sells several smaller product categories, including luggage, bedding, rugs, and curtains, which combined account for an additional ███ of sales. *Id.* Two years ago, Quince.com began selling a chef's knife, which retails for $69.90. *Id.* ¶ 6. Since then, Quince.com has launched additional cookware products, including pots, pans, silverware, and napkins. In aggregate, however, cookware comprises less than ███ of Quince.com's sales. *Id.*[1]

On the other hand, Plaintiff operates a restaurant called "Quince" with a single location in San Francisco's Jackson Square neighborhood. Briers Decl. ¶ 2. The restaurant offers two menus to its customers: a lighter tasting menu for $270, and a more extensive one for $360. *Id.* ¶ 3. Restaurant goers can choose to add several "supplements" and beverage pairings, which increase the price further. The restaurant initially opened in 2003, but was closed for most of 2020 and 2023. *Id.* ¶ 4.

Plaintiff has never operated any business other than its restaurant. While it contends that "Chef Tusk is invited to consult on numerous culinary projects," Mot. 5, it does not identify any product it has ever sold under the name "Quince." Plaintiff states that Mr. Tusk is "currently collaborating" with a third party to develop "handmade chef knives," *id.* at 6, but no such knife has ever been sold. Mr. Tusk's declaration acknowledges that the purported "chef knife" will not debut until June 2024, and that it will be priced at $990 per knife. *See* ECF No. 9-2 ("Tusk Decl.") Ex. 1.

The parties' customers and marketing channels also do not overlap. Quince.com's customers are online, budget-focused shoppers, geographically distributed throughout the country. Only ███ of visitors to Quince.com are in San Francisco. Milligan Decl. ¶ 7. Quince.com markets its brand in television, newspaper, YouTube, and social media advertisements. *Id.* ¶ 3. In contrast, Plaintiff's restaurant is only in San Francisco and caters to affluent foodies. Plaintiff has not submitted any evidence that it has engaged in advertising, let alone in the same channels as Quince.com.

---

[1] Quince.com sent a single marketing email, which touted its cookware as "Michelin-worthy." Gupta Decl. ¶ 12. Quince.com did not intend to make any association with Plaintiff's restaurant. However, in recognition of concerns raised by Plaintiff, Quince.com has never used "Michelin" in any other marketing materials or promotional emails. *Id*.

**D.      FedEx Inadvertently Forwarded Packages to Plaintiff's Location.**

Quince.com uses several shipping partners to deliver its products to consumers, including DHL, UPS, FedEx, and the U.S. Postal Service. Cox Decl. ¶ 3. Between November 2023 and February 2024, one of these partners—FedEx—inadvertently forwarded 8 packages to Plaintiff instead of Quince.com (which had recently changed office locations) after they were deemed undeliverable to Quince.com's customers due to a damaged or missing shipping label. *Id.* ¶¶ 4–10.[2] While the inconvenience this caused Plaintiff is regrettable, this error by FedEx was not the result of consumer confusion—the packages were never even delivered to the customer. It was a simple mistake by the courier, who was attempting to return the packages to the sender but did not have the correct return address. This error has not been made by any of Quince.com's other shipping partners. *Id*. ¶ 12. Quince.com informed FedEx of the mistake, and on February 16, 2024, FedEx assured Quince.com that it has put into place new quality assurance processes to ensure that no additional packages will be forwarded to Plaintiff. *Id*. ¶¶ 10–11.

**E.      The Six Errant Reviews Identified by Plaintiff Were Promptly Removed.**

More than ▉▉▉▉▉ orders have been placed on Quince.com, and consumers have left more than 250,000 reviews regarding the products they purchased on Quince.com. Milligan Decl. ¶¶ 2, 8. Plaintiff identifies six instances of reviews posted on its Yelp or Better Business Bureau ("BBB") profile, which appear intended for Quince.com. *See* Mot. 9–10. After Plaintiff informed Quince.com of these misclassified reviews, Quince.com promptly had them moved to Quince.com's Yelp or BBB profile. *See* Briers Decl. ¶ 12.

**F.      Quince.com Applied for a Trademark, Which Was Preliminarily Approved.**

On April 28, 2021, Quince.com filed two applications to register the mark "Quince." The first application is for use for "on-line retail store services featuring housewares." Briers Decl. ¶ 8. The second application is for "housewares," such as "bed sheets, pillow covers, shams, comforters, duvet covers, blankets . . . , quilts, bath linens, dining linens, [and] table runners." *Id.*

---

[2] FedEx also forwarded sheepskin rugs to Plaintiff in October 2022. These rugs were initially addressed to Quince.com's old office location, which Quince.com vacated in September 2022. Cox Decl. ¶ 9. When FedEx deemed them undeliverable, it incorrectly forwarded them to Plaintiff. *Id.*

In reviewing Quince.com's applications, the Trademark Examiner performed a search for other registered marks including the name "Quince." *Id.* ¶ 9. That search identified 112 different active trademark filings, including Trademark Registration No. 5,730,261 ("the '261 Registration"), which was owned by a catering company in Minnesota at the time, but was subsequently purchased by Plaintiff shortly before it filed this case. *Id.* ¶ 9. On October 11, 2023, the Trademark Examiner approved Quince.com's applications for publication. *Id.* ¶ 11. In so doing, the Trademark Examiner concluded that Quince.com's use of "Quince" did not create a likelihood of confusion with any of the other trademark registrations she had identified, including the '261 Registration. *Id.* (describing provision of Trademark Manual of Examining Procedure).

### G.     Shortly Before Filing Suit, Plaintiff Purchased the '261 Registration.

Plaintiff never obtained a trademark registration for its use of the name "Quince" in connection with its restaurant. Recognizing that this presented a weakness for its litigation position, Plaintiff *purchased* the '261 Registration from an unaffiliated caterer in Minnesota in July 2023. Briers Decl. ¶¶ 5–7. The '261 Registration applies only to "catering services" and other "culinary entertainment" and "food preparation services." Plaintiff purchased only the registration; it did not purchase the catering company, which continues to operate as "Quince." *See id.* ¶ 7.

Importantly, the catering company's '261 Registration was rejected by the Trademark Office for registration on the Principal Register. The Trademark Examiner concluded that, as applied to food services, the word "quince" is descriptive and therefore not entitled to trademark protection. In the words of the Examiner, "quince" is a "type of acidic fruit," and "merely describes an ingredient found in [Plaintiff's] services," which "may feature quince fruit or quince flavorings as a food ingredient." *Id.* ¶ 6, Ex. B at 2. As a result, the '261 Registration was recorded only on the Supplemental Register and is not entitled to any presumption of validity or distinctiveness.

### H.     Shortly Before Filing Suit, Plaintiff Redesigned Its Logo.

Between 2013 and November 2023, Plaintiff consistently used a specific, stylized "Quince" logo for its restaurant, which is reproduced in Figure 1 below. That logo had a distinctive font and type face style. *See* Briers Decl. ¶ 13 (detailing the distinctive appearance). In particular, the "Q" had a long tail that looped inside the circle, extending to the right and underlining the remaining

letters. *Id.* When Quince.com launched in June 2020, it introduced its own distinct "Quince" logo, which was significantly different from Plaintiff's logo and is reproduced in Figure 2 below. Quince.com's logo has a traditional "Q." *Id.* ¶ 14 (describing appearance). Remarkably, just days before filing this suit, Plaintiff altered the logo it had been using for at least a decade. In November 2023, Plaintiff adopted a new logo, reproduced in Figure 3 below, that is virtually identical to the logo Quince.com had been using for more than three years. *Id.* ¶ 15.



| Fig. 1: Plaintiff's Logo (2013 through Nov. 2023) | Fig. 2: Quince.com's Logo (June 2020 through present) | Fig. 3: Plaintiff's Revised Logo (Nov. 2023 through present) |

**I.     Plaintiff Offered to License the Name "Quince" to Defendant for $12 Million, Then Filed this Case When Defendant Refused.**

Plaintiff's counsel initially sent a cease-and-desist letter to Quince.com on December 21, 2022, nearly one year prior to filing this case. Quince.com promptly responded. Plaintiff never took any action on its allegations until it filed this litigation on November 21, 2023. Even after filing this case, Plaintiff did not serve the summons on Defendant for an additional eleven weeks, finally executing service on February 5, 2024. *See* ECF No. 8 (Proof of Service).

Before serving the summons, Plaintiff said that it would grant Quince.com "a license to continue using the name QUINCE, but only for a large sum of money." Briers Decl. ¶ 21, Ex. O. Specifically, Plaintiff demanded that Quince.com pay it "$12 million," which it said would "compensate [it] for the ongoing confusion, misdirected packages . . . and other confusion." *Id.* Quince.com rejected Plaintiff's demand. Plaintiff filed this motion two weeks later.

**III.     ARGUMENT**

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Id.* at 20. Plaintiff has failed to establish any of the requisite *Winter* factors.

**A.    Plaintiff Has Not Established It Is Likely to Succeed on the Merits.**

A plaintiff alleging trademark infringement must prove both "(1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011). Plaintiff has not established it is likely to prevail on either element.

**1.    Plaintiff Has Not Established That It Has a Protectable Trademark.**

Plaintiff has not established that it owns a protectable trademark interest in the name "Quince," which is descriptive when used in connection with Plaintiff's restaurant. The trademark registration Plaintiff purchased and now asserts is for a Minnesotan catering company, and provides no protection for Plaintiff's San Francisco-based restaurant.

*(a)    Plaintiff's Mark Is Descriptive, and Plaintiff Has Not Even Attempted to Show It Has Acquired Secondary Meaning.*

Plaintiff's mark is descriptive, meaning that it "describes a characteristic or ingredient of an article or service." *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979). In Plaintiff's case, the mark "Quince" describes a quince fruit, which is an ingredient used in Plaintiff's restaurant service. That is why the Trademark Office already held that the mark "Quince" is descriptive when used for catering and food preparation services, and why the '261 Registration was relegated to the Supplemental Register. Briers Decl. ¶ 6, Ex. B; *see Fashion Week, Inc. v. Council of Fashion Designers of Am., Inc.*, 2016 WL 4367990, at *6 (S.D.N.Y. Aug. 12, 2016) ("The very presence of the mark on the Supplemental Register indicates a preliminary determination that the mark is not distinctive of the applicant's goods." (quoting *McCarthy on Trademarks & Unfair Competition* ("*McCarthy*") § 19:36 (4th ed. 2014)).

Merely descriptive marks are, by definition, not distinctive and not entitled to protection. *Surgicenters*, 601 F.2d at 1014. A descriptive mark becomes protectable only "by acquiring a secondary meaning." *Id*. Plaintiff bears the burden of proving that its mark has acquired a secondary meaning by showing "that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 113 (1938).

Plaintiff submitted no evidence that its use of "Quince" has acquired secondary meaning. Although "survey evidence is the most direct and persuasive way of establishing secondary meaning," *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 796 (5th Cir. 1983), Plaintiff did not submit any survey evidence. *See Audio-Technica Corp. v. Music Tribe Com. My Sdn. Bhd.*, 2022 WL 1423223, at *4 (C.D. Cal. May 5, 2022) ("The canonic way of demonstrating secondary meaning is by conducting a survey."). In contrast, Quince.com has submitted a comprehensive *Eveready* survey, which is described in Section III(A)(2)(a) below. That unrebutted survey demonstrates that consumers do *not* primarily associate the word "Quince" with Plaintiff or its restaurant. *See Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 232–33 (3d Cir. 2017) ("Even though [the *Eveready*] survey design is most helpful for illustrating a likelihood of confusion, it can also indicate secondary meaning" based on "familiarity with the senior mark."). Indeed, not a single one of the 455 survey respondents identified any connection between the name "Quince" and Plaintiff or its restaurant. *See* Iyengar Decl. ¶¶ 39 n.64, 60, 62, Ex. F.

Plaintiff wrongly suggests that, because the '261 Registration has been on the Supplemental Register for five years, the Court should excuse it from its burden of proving secondary meaning. *See* Mot. 14. That is not the law. "While a Principal Registration may become incontestable after five years of registration, a Supplemental Registration can *never* achieve that evidentiary status." *McCarthy* § 19:36 (emphasis added). In the sole case Plaintiff cites, secondary meaning was found only after the plaintiff submitted a survey that "demonstrated that 75 percent of the persons questioned volunteered" plaintiff's mark as a brand name for plaintiff's wine coolers. *Cal. Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1456 (9th Cir. 1985). Plaintiff submits no such evidence here. Plaintiff also cannot rely solely on online reviews (Mot. 14) because "[p]roof of a product's popularity should not be equated with proof of secondary meaning." *20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 747 F.2d 81, 90 n.9 (2d Cir. 1984).[3]

---

[3] A descriptive common-law trademark is geographically limited to only those regions where it acquires secondary meaning *before* the first instance of alleged infringement. *See Converse, Inc. v. Skechers U.S.A., Inc.*, 909 F.3d 1110, 1120 n.6 (Fed. Cir. 2018) ("[I]n order to prevail on a claim of infringement, secondary meaning must have been acquired by the date of first infringing use."). Plaintiff has submitted absolutely no evidence about whether it had acquired secondary meaning in specific regions of the country as of June 2020, when Defendant began using its "Quince" mark.

Plaintiff has not established that its use of "Quince" acquired secondary meaning, and for that reason its request for a preliminary injunction must be denied. *See, e.g.*, *Shaklee Corp. v. HarperCollins Publishers, LLC*, 2011 WL 13278220, at *2 (N.D. Cal. Feb. 1, 2011) (Plaintiff "has yet to offer any consumer recognition evidence, and the court will not presume its own assessment is a sufficient proxy for the views of the relevant consuming public."); *Cazet v. Epps*, 2010 WL 2474382, at *2 (N.D. Cal. June 11, 2010) (denying TRO where plaintiffs failed "to demonstrate the existence of secondary meaning and, thus, that they have a protectable mark"); *Fashion Week*, 2016 WL 4367990, at *7 (denying preliminary injunction for same reason).

*(b)     Plaintiff Did Not Acquire Any Right in the '261 Registration.*

Even if Plaintiff had established that the '261 Registration acquired secondary meaning, Plaintiff's purchase of the registration is invalid as being "in gross." *See Mister Donut of Am., Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir. 1969) ("[N]o rights can be transferred apart from the business with which the mark has been associated."). Assignments in gross are invalid because an assignee's use of a mark in connection with a "different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999).

The '261 Registration registered to an entity called Quince Hospitality, LLC, which is based in Minnesota. Briers Decl. ¶ 5. Plaintiff purchased only the '261 Registration—it did not purchase Quince Hospitality's catering business. Quince Hospitality continues to operate, and is owned by Chef Brooke Faudree, who has no affiliation with Plaintiff. *Id.* ¶ 7, Ex. D. Plaintiff "did not intend to adopt or exploit any 'goodwill'" associated with Quince Hospitality's services in Minnesota. *See PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 288–90 (8th Cir. 1969). Plaintiff's purchase is therefore invalid. *See Airs Fragrance Prods., Inc. v. Clover Gifts, Inc.*, 395 F. App'x 482, 484 (9th Cir. 2010) ("Any claim to current ownership of the marks on the basis of [assignor's] previous ownership and use of them therefore could only be brought by [assignor], not [assignee].").

**2.      Plaintiff Has Not Established a Likelihood of Consumer Confusion.**

Even if Plaintiff had proven a protectable trademark right, its claims would still fail because Plaintiff also has not demonstrated that Quince.com's use of the mark is likely to cause consumer

confusion. To assess the likelihood of confusion, courts employ the well-known *Sleekcraft* factors. When evaluated in total, the eight *Sleekcraft* factors demonstrate that confusion is unlikely. Quince.com has also submitted an unrebutted survey, conducted by an experienced expert in survey design, which found *zero* instances of confusion. *See* Iyengar Decl. ¶¶ 60, 62. Plaintiff's "failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." *Essence Comm'ns, Inc. v. Singh Indus., Inc.*, 703 F. Supp. 261, 269 (S.D.N.Y. 1988).

(a)      *Unrebutted Survey Evidence Shows No Confusion.*

Survey evidence "is often the most persuasive evidence" in assessing the likelihood of confusion. *Cairns*, 24 F. Supp. 2d at 1041. "Consequently, a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable." *Id.* This is particularly true when, as here, the defendant offers its own, unrebutted survey demonstrating no confusion. *See Essence*, 703 F. Supp. at 269 (denying motion for preliminary injunction where defendant offered unrebutted survey finding no confusion).

Dr. Iyengar conducted a survey of 455 respondents, which found zero instances of confusion. Iyengar Decl. ¶¶ 6, 60, 62. The survey was conducted using the *Eveready* survey design, which "has become a standard and widely accepted survey format for testing to shed light on whether confusion is likely or not." *McCarthy* § 32:174. Consistent with the *Eveready* design, the survey presented respondents with Quince.com's webpage for either home goods or kitchen products. Iyengar Decl. ¶¶ 6, 14.[4] The survey then asked respondents a series of questions, including to identify who made the products, what other products or services the company offered, and whether any other company or person's permission or endorsement was necessary. *Id.* ¶¶ 37–46, Exs. C–D. In response, not a single respondent identified Plaintiff or Plaintiff's restaurant. *Id.* ¶¶ 6, 60. This is compelling evidence that confusion is unlikely. Moreover, Plaintiff's failure to offer its own survey "carries with it an inference that the results of such a survey would have been unfavorable to its position." *Scat Enters., Inc. v. FCA US LLC*, 2017 WL 5896182, at *3 (C.D. Cal. June 8, 2017).

---

[4] Home goods and kitchen products comprise a small portion of Defendant's total sales. However, these are the product categories Plaintiff contends are most related to its own services. For that reason, Dr. Iyengar tested those product categories "to be most conservative in favor of Plaintiff." Iyengar Decl. ¶ 13.

*(b)    Strength of the Mark: Plaintiff's Mark Is Merely Descriptive.*

Plaintiff's trademark is conceptually and commercially weak. With respect to conceptual strength, Plaintiff's use of "Quince" is merely descriptive because it "describes a characteristic or ingredient" of Plaintiff's restaurant services. *Surgicenters*, 601 F.2d at 1014. Descriptive marks, such as Plaintiff's, are inherently weak. *See Nutri/System, Inc. v. Con-Stan Ind., Inc.*, 809 F.2d 601, 605 (9th Cir. 1987) (stating "descriptive or suggestive marks are 'weak'" and "[a]mong 'weak' marks, courts bestow less protection on a descriptive mark than a suggestive one").

Plaintiff's trademark also is commercially weak. Plaintiff has not adduced any evidence that its use of the name "Quince" has acquired such prominence in the public imagination that the word "Quince" is now primarily associated with its restaurant. The Federal Register itself demonstrates the weakness of Plaintiff's mark: there are 29 active or pending trademark registrations that include the word "Quince," including 10 that include *only* the word "Quince." Briers Decl. ¶ 17, Ex. K. These registrations are for a wide variety of goods and services, including pharmaceutical products; health clinical services; electronic data interchange services; building materials; faucets; Christmas decorations; fruit pulp; jewelry; yarn; dresses, and many more. *Id.*[5] "In a 'crowded field' of similar marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd." *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988).

Plaintiff's use of the name "Quince" is further diluted by the great number of businesses with the same name. Nationwide there are at least 117 businesses whose names include "Quince." *See* Iyengar Decl. ¶ 61, Ex. G. Plaintiff is not even the only restaurant named "Quince"—there are at least 10 restaurants and catering companies nationwide named "Quince" that have no affiliation with Plaintiff. *See* Briers Decl. ¶ 18. The sheer number of businesses (and restaurants) that use "Quince" in their name demonstrates that Plaintiff's use is neither unique nor distinctive. When, as

---

[5] While some of these businesses use "quince" as the Spanish word for "fifteen," the Trademark Office determined that this is not a relevant point of distinction. *See* Briers Decl. ¶ 17, Ex. J ("Applicant argues that its mark is a single-syllable English word pronounced as 'kwins' while registrant's marks are two syllable Spanish words pronounced as 'keen-seh.' There are no accent marks or depictions of fruit or numbers to guide consumers on the intended pronunciation of the marks. Furthermore, as case law supports, there is no correct pronunciation of a mark; thus, consumers may pronounce a mark differently than intended by the mark owner.")

here, "the marketplace is replete" with businesses "using a particular trademarked word," it "indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will *not* be confused by its use." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002) (emphasis in original); *McCarthy* § 11:85 ("A mark that is hemmed in on all sides by similar marks on similar goods or services cannot be very 'distinctive.'").

The limited geographic scope of Plaintiff's business also demonstrates the commercial weakness of its mark. Plaintiff operates a single restaurant in San Francisco, but it seeks to enjoin Quince.com from continuing to sell to its customers nationwide. The "relevant market" for assessing the strength of Plaintiff's mark is "the pool of actual and potential customers" of Quince.com's products, "for it is those patrons whose potential confusion is at issue." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 132 (2d Cir. 2004). Even if Plaintiff had demonstrated that its mark was known among consumers in San Francisco (which it has not), "the fact that a mark has selling power in a limited geographical or commercial area does not endow it with a secondary meaning for the public generally." *Id.* at 133 (affirming denial of motion for preliminary injunction brought by a single-location restaurant). Plaintiff has failed to demonstrate that its trademark is strong or distinctive in the nationwide market where Quince.com sells its products.

> (c)    *Proximity of Goods: The Parties' Goods and Services Are Distinct.*

This factor is dispositive in this case. Where, as here, the parties' goods and services "are totally unrelated, there can be no infringement because confusion is unlikely." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). Quince.com sells apparel; personal accessories, such as jewelry and handbags; and home goods, such as bed linens, rugs, and drapes. Milligan Decl. ¶ 5. Quince.com has become prominent for selling simple, "essential" products at affordable prices. Gupta Decl. ¶ 10. In contrast, Plaintiff operates a single restaurant in San Francisco, which sells elaborate tasting menus at exorbitant prices. Plaintiff has never sold any consumer goods, nor has it ever operated a retail website.

Differences in the geography and retail channels of the parties' consumer bases further distinguish their products and services. Plaintiff does not operate anywhere other than in the city of San Francisco, which is important because "dining services require a customer's physical presence

and cannot rely, for instance, on Internet or mail-order sales." *Brennan's, Inc.*, 360 F.3d at 134. On the other hand, Quince.com sells its products exclusively on its website, and its consumer base is nationwide—only ▉ of visitors to Quince.com are in San Francisco. Milligan Decl. ¶ 7; *see Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 893 (N.D. Cal. 2019).

The *Kiva* decision is instructive here. In that case, the plaintiff and defendant both used the name "Kiva" to sell food products: plaintiff sold "health and wellness foods," while defendant sold "cannabis-infused chocolates." 402 F. Supp. 3d at 881. Judge Breyer denied plaintiff's motion for a preliminary injunction, despite the fact that the parties both used the same mark, both sold food products, and the plaintiff had logged nine pages of "phone calls and emails received from consumers" who were purportedly confused. *Id.* at 892–95. The court reasoned that the "proximity of the goods" factor "weigh[ed] heavily against confusion" because, although parties "both [sold] food items," the products were distinct because defendant's contained cannabis, whereas plaintiff's were "health food" that was sold "on the internet." *Id.* 893. "The differences in the goods sold" and the distinct "marketing channels used" meant that there was "not a significant likelihood of confusion." *Id.* at 896. The products and services at issue in this case—Plaintiff's luxury restaurant and Quince.com's affordable "essentials"— are far more distinct than those at issue in *Kiva*.

Plaintiff's argument that the parties' products overlap because both parties sell "chef knives" is made from whole cloth. Quince.com began selling a chef's knife on its website two years ago, in February 2022, and since then has begun selling several additional cookware products. Milligan Decl. ¶ 6. But cookware products comprise less than ▉ of Quince.com's total sales, *id.*, and Plaintiff's exclusive focus on this *de minimis* product category is misleading. More importantly, Plaintiff has *never* sold any cookware. To advance its litigation position, Plaintiff states only that Chef Tusk is "currently collaborating" with a third party to develop "high-end, handmade chef knives." Mot. 6. But no such knife has ever been delivered to a customer. In fact, in a social media post, the third-party knifemaker explained that he initially made knives for use in Plaintiff's restaurant; not for sale to the public. Briers Decl. ¶ 19, Ex. L. The website stating that the knifemaker was willing to make additional knives for sale to the public did not launch until January 2024—just before Plaintiff filed this motion—and even then, those knives will not be available until June 2024.

*Id.* ¶ 19, Ex. M; *see also* Tusk Decl. Ex. 1. Thus, the "overlap" Plaintiff claims in the parties' products is, at best, speculative and, at worst, manufactured.

Even if Plaintiff were capable of establishing a genuine history of selling knives, the knife it identifies is entirely dissimilar from those sold on Quince.com. Plaintiff's "high-end, handmade" knife, Tusk Decl. ¶ 17, will be made by an individual artisan, Everett Noel, who typically sells his products at luxury craft shows, and it will sell for $990 on his website, Briers Decl. ¶ 19. That is *fourteen-times* more expensive than the chef knife sold on Quince.com, which retails for $69.90, and is described as an "essential" knife made in China. Given their differences in craftsmanship and price, it is nearly impossible to imagine that the customer bases for the two knives overlap. *See BBK Tobacco & Foods, LLP v. Cent. Coast Agric. Inc.*, 615 F. Supp. 3d 982, 1016 (D. Ariz. 2022) (finding the "price disparity" between defendant's cannabis resin product, which sold for between $46 and $63, and plaintiff's rolling papers, which sold for between $4.30 and $26.99, "suggests that distinct groups of consumers purchase the parties' products and, accordingly that confusion is less likely to occur").

Despite its efforts to feign a diversified business for purposes of this motion, Plaintiff only operates a restaurant; it uses cookware, it does not sell it. Despite this, Plaintiff emphasizes Quince.com's cookware products, which comprise less than ▉ of its total sales, and Plaintiff does not even contend that there is overlap with respect to the products that make up the remaining ▉ of Quince.com's sales: apparel, jewelry, handbags, luggage, bedding, and curtains.

> (d)    *Similarity of the Marks: The Marks' Similarity Stems From Plaintiff's Copying the Appearance of Quince.com's Logo.*

This factor is neutral. While the parties' marks are similar, Plaintiff's argument that they "are identical in every way, including the font," Mot. 16, is incorrect and misleading in two respects.

First, Plaintiff's argument based on the marks' appearance and font is outright deceptive. To be sure, marks must be compared "in their entirety and as they appear in the marketplace," *Nutri/System*, 809 F.2d at 605–06, meaning the Court must consider the marks' font and typeface. But in this case, the parties' marks only appear similar because *Plaintiff* copied the appearance of Quince.com's logo—not the other way around. *See* Briers Decl. ¶¶ 13–15. This copying occurred

only a few days before Plaintiff filed its complaint, belying any suggestion that it was unknowing. *Id.* ¶ 15. Plaintiff's antics are improper and do not change the analysis. The relevant time of comparison is "the date of first [allegedly] infringing use." *Converse*, 909 F.3d at 1120 n.6. Therefore, the critical question is whether the parties' marks appeared similar in June 2020, when Quince.com launched. At that time, Plaintiff's mark looked entirely different; the marks were readily distinguishable. The Court should not consider revisions Plaintiff made days before filing suit.

Second, the parties' marks do not evoke the same connotations, nor are they intended to. Plaintiff named its restaurant after a pear-shaped fruit. In contrast, Quince.com uses the name because it is "a shortened version of quintessentials," which evokes the company's aspiration to sell "essential" products. Gupta Decl. ¶ 6, Ex. A. The parties' use of the word to evoke different connotations weighs against a likelihood of confusion. *E.g., Revlon, Inc. v. Jerell, Inc.*, 713 F. Supp. 93, 98 (S.D.N.Y. 1989) ("Such differences of connotation and meaning are key factors in determining the likelihood of confusion. Differing connotations themselves can be determinative, even where identical words with identical meanings are used."); *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369 (Fed. Cir. 2012) ("[D]espite their undisputed similarity, the marks have different meanings and create distinct commercial impressions.").

> (e)    *Evidence of Actual Confusion: Plaintiff's* De Minimis *Evidence of Confusion Does Not Show Actionable Source Confusion, and Is Outweighed by Defendant's Unrebutted Survey.*

This factor weighs against a likelihood of confusion. When assessing the existence of actual confusion, survey evidence "is often the most persuasive evidence," and a plaintiff's failure to conduct a survey weighs against a finding of actual confusion. *Cairns*, 24 F. Supp. 2d at 1041 (denying motion for preliminary injunction where "plaintiffs have not submitted survey results . . . before seeking injunctive relief"). In this case, as in *Cairns*, Defendant submitted an unrebutted survey that demonstrates confusion is exceptionally unlikely. *Id.* at 1040 ("While plaintiffs present some evidence of actual confusion, that evidence is outweighed by defendants' survey evidence and the presumption that plaintiffs' failure to conduct a survey indicates the results of such a survey would be unfavorable for plaintiffs."). Dr. Iyengar's survey found *zero* confusion, Iyengar Decl. ¶¶ 6, 60, 62, which is particularly probative given that "the great weight of authority" is that any

survey result showing less than 10% confusion "will indicate that confusion is *not* likely," *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013) (quoting *McCarthy* § 32:189).

The few instances of misdirected packages and online reviews that Plaintiff identified do not establish actionable consumer confusion, and each of them has been remedied by Quince.com. For example, Plaintiff notes that, for a short period of time, FedEx incorrectly forwarded undeliverable packages to Plaintiff's restaurant. *See* Mot. 7–9. This was not the result of consumer confusion. In each instance, these were packages that FedEx deemed undeliverable to the intended recipient, typically because the shipping label was damaged or missing. Cox Decl. ¶¶ 5, 10. Unable to identify the correct return address for Quince.com, FedEx incorrectly forwarded them to Plaintiff. FedEx acknowledged this mistake, and on February 16, 2024, it assured Quince.com that it implemented new processes to ensure that no more packages are misdirected. *Id.* ¶¶ 10–11. Courts regularly hold that these types of clerical errors do *not* constitute evidence of confusion.[6]

The generic "calls" and six online reviews Plaintiff identified (Mot. 7, 9–10) also do not reflect confusion by consumers about the source of Quince.com's products. The contents of the online reviews indicate they were posted by individuals who clearly knew they purchased a product from Quince.com. None mentions Plaintiff or its restaurant. It appears the misdirected calls and reviews were by individuals who carelessly navigated the phone directory or review website, indicative of "inattentiveness on the part of the caller or sender rather than actual confusion." *Duluth*

---

[6] *See, e.g.*, *Nutri/System*, 809 F.2d at 605–06 ("misdirection of several letters and checks proved insignificant"); *U.S. Blind Stitch Mach. Corp. v. Union Special Mach. Co.*, 287 F. Supp. 468, 471 (S.D.N.Y. 1968) ("secretarial carelessness caused by a failure to check business addresses" does not prove the public has been misled); *Duluth News-Trib. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) ("evidence of misdirected phone calls and mail . . . [is] de minimis and [shows] inattentiveness on the part of the caller or sender rather than actual confusion"); *Allstate Ins. Co. v. Allstate Inv. Corp.*, 210 F. Supp. 25, 29 (W.D. La. 1962) ("[M]ere carelessness on the part of the postal service or of persons consulting the . . . telephone directory . . . does not mean that there is confusion in the public mind as to the nature of the products or services offered."); *Polaroid Corp. v. Polarad Elecs. Corp.*, 182 F. Supp. 350, 354 (E.D.N.Y. 1960) (dismissing evidence of "misdirected letters and statements" as "clearly due to palpable carelessness on the part of the clerks or other subordinate employees involved therein"); *B.D. Commc'ns, Inc. v. Dial Media, Inc.*, 429 F. Supp. 1011, 1014 (S.D.N.Y. 1977) ("The several instances of misdirected mail, in and of themselves, are insufficient to sustain a finding of likelihood of confusion."); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978) ("nineteen misdirected letters received" over four years was "extremely minimal evidence" of confusion); *Amica Mut. Ins. Co. v. R. H. Cosmetics Corp.*, 204 U.S.P.Q. 155, at *8 (T.T.A.B. 1979) ("ten letters which were received over a five-year period" were "inconsequential, insignificant, and of no legal consequence").

*News-Trib.*, 84 F.3d at 1098. Each of the six reviews has been remedied: Quince.com contacted the review platforms and promptly had them moved to Quince.com's profile. Briers Decl. ¶ 12.

The few instances of errant reviews Plaintiff identified are *de minimis* relative to the high volume of Quince.com's transactions. Infrequent and isolated instances of confusion, viewed against a high volume of transactions, are treated as *de minimis* and not probative of actual confusion. *See, e.g.*, *Globefill Inc. v. Elements Spirits, Inc.*, 2016 WL 8944644, at *5 (C.D. Cal. Sept. 20, 2016) (denying preliminary injunction and finding "twenty screenshots of social media postings" were "neither sufficient nor persuasive evidence of actual confusion"). Such is the case here. Plaintiff presents thin evidence of only six mistaken reviews. But more than ▮▮▮▮▮ products have been purchased on Quince.com, and more than 250,000 customers have correctly submitted reviews for Quince.com's products. Milligan Decl. ¶¶ 2, 8. Thus, even if the six reviews identified by Plaintiff reflected actual confusion, the implied confusion rate would be only 0.00015%—more improbable than being struck by lightning.[7] Courts regularly hold that such low rates of confusion are not probative. *See, e.g.*, *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (confusion in 7 "out of 80,000 mailed" listing forms was "only *de minimis* evidence of actual confusion"); *Nutri/System*, 809 F.2d at 605–06 ("[I]n light of both parties' high volume of business, the misdirection of several letters and checks proved insignificant.").[8]

Ultimately, Plaintiff's weak evidence of confusion does not outweigh Defendant's strong survey evidence, which plainly shows that no likelihood of confusion exists. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th. Cir. 1985) (en banc) ("Survey evidence and testimony

---

[7] The odds of being struck by lightning are approximately 1/15,300 or 0.0065%. Briers Decl. ¶ 22.

[8] *E.g., C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985) (two letters "insignificant when contrasted to the hundreds of thousands of magazines"); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (same); *Petro Stopping Ctrs., L.P. v. James River Petroleum*, 130 F.3d 88, 95 (4th Cir. 1997) ("In light of its huge volume of commerce, [plaintiff's] meager evidence of actual confusion is at best de minimis."); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999) ("seven examples of actual confusion" were "*de minimis*"); *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1151 (10th Cir. 2013) ("[F]our instances . . . are isolated episodes with minimal probative value."); *GOLO, LLC v. Goli Nutrition Inc.*, 2020 WL 5203601, at *9–10 (D. Del. Sept. 1, 2000) ("While Plaintiff offers the numerator in its determination of actual confusion events, its argument leads to the question: what is the denominator? . . . Crediting all these submissions, the evidence of actual confusion is isolated and idiosyncratic.").

may . . . outweigh whatever circumstantial evidence has been introduced."). Thus, this factor weighs strongly against a likelihood of confusion. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005) (finding this factor weighed against confusion where "[a] single retailer and a single customer mistook one [of defendant's] products" as plaintiff's, and where "[a] survey commissioned by [defendant] showed an absence of significant confusion").

> *(f)* *Marketing Channels Used: There Is No Overlap in Marketing.*

Plaintiff and Quince.com do not share any overlapping marketing or distribution channels, weighing strongly against a likelihood of confusion. Courts "examine the proximity of the marketing channels to one another and whether direct competition exists." *Nutri/System*, 809 F.2d at 606. Where the parties' goods or services "differ significantly in the method of operation, the socioeconomic customer group served and the facilities in which they offer their services. . . . [T]he channels of trade do not converge, and there is little likelihood of confusion." *Id.*

Plaintiff's restaurant serves in-person diners in San Francisco. Quince.com operates exclusively as an e-commerce retailer, selling to online customers nationwide. Quince.com has invested over ███████ to market its brand via television, newspaper, YouTube, and social media advertisements. Milligan Decl. ¶ 3. Plaintiff does not contend it advertises in any of these channels.

Plaintiff attempts to construct convergence by arguing that both parties advertise on the Internet. *See* Mot. 18–19. But Plaintiff has not submitted any evidence that it has ever advertised in any e-commerce channel. Plaintiff states only that it has an Instagram user account (not that it advertises on Instagram) and that it maintains a website. The Ninth Circuit has found this type of generic Internet presence to be irrelevant, explaining that "this factor becomes less important when the marketing channel is less obscure. Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1137; *see also Rise Basketball Skill Dev., LLC v. K Mart Corp.*, 2017 WL 4865561, at *6 (N.D. Cal. Oct. 2017) ("The products are not sold in the same stores, online or offline. That these products are both sold online [i]s not nearly enough to make the market channels highly similar.").

The parties' "socioeconomic customer group" also does not overlap. *Nutri/System*, 809 F.2d at 606. Quince.com sells affordable apparel and accessories to online, budget-focused consumers. Its customers are broadly distributed geographically, with only ███ in San Francisco. Plaintiff's restaurant serves some of the wealthiest culinary enthusiasts in San Francisco.

(g)     *Degree of Care: The Relevant Consumers Are Discerning.*

The wealthy diners at Plaintiff's restaurant are highly discerning, which weighs strongly against a likelihood of confusion. The parties agree that "when the goods are expensive, the buyer can be expected to exercise greater care in his purchases," *Network Automation*, 638 F.3d at 1152, but Plaintiff opted in its motion to ignore its own customer base.

Plaintiff is one of San Francisco's most expensive restaurants, charging $360 per person for its traditional tasting menu. Courts agree that sophisticated consumers seeking luxury, Michelin-rated dining experiences—such as those offered by Plaintiff—are highly discerning, which weighs against a likelihood of confusion. *See, e.g., Marlinspike Hall LLC v. Bar Lab Concepts LLC*, 2023 WL 6847208 (S.D.N.Y. Oct. 17, 2023) (plaintiff's "high-end . . . menu offerings and pricing, as well as its Michelin review" weighed against confusion); *Sorenson v. WD-40 Co.*, 792 F.3d 712, 729 (7th Cir. 2015) ("A Michelin-starred French restaurant is wholly different from a Chinese take-out restaurant."); *Hard Rock Cafe Int'l USA, Inc. v. RockStar Hotels, Inc.*, 2018 WL 7825183, at *12–13 (S.D. Fla. June 13, 2018) (hotel offered boutique experiences like "a cooking class with an executive chef from a Michelin-rated restaurant," weighing against confusion). The same is true of the hand-crafted knife purportedly endorsed by Plaintiff that is priced at $990. *See Network Automation*, 638 F.3d at 1152; *World Champ Tech LLC v. Peloton Interactive, Inc.*, 2024 WL 665181, at *13 (N.D. Cal. Feb. 16, 2024) ("[C]onsumers in specialized, niche markets may be very sophisticated as to brands and discerning in their purchases.").

Although operating at a different price point, Quince.com's online customers are no less discerning. Indeed, numerous courts have noted that Internet purchasers exercise a high degree of care. *See Future Fields, LLC v. Future Scouts*, 2021 WL 6104311, at *5 (C.D. Cal. Nov. 24, 2021) (denying preliminary injunction in part because "Internet users now utilize a higher degree of care in their searching, particularly given the proliferation of scams and other known risks of shopping

online, and are *generally quite sophisticated* about their Internet browsing" (emphasis added)); *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010) ("Unreasonable, imprudent and inexperienced web-shoppers are not relevant.").

Put simply, Defendant's customers are discerning online retail shoppers, and Plaintiff's are sophisticated restaurant-goers who spend hundreds of dollars on a single meal. Neither group is likely to be confused, and this factor cuts sharply against a likelihood of confusion.

*(h)    Intent: Defendant Had No Intent to Copy or Deceive.*

The parties agree the intent factor is minimally important. *See* Mot. 20. Regardless, it weighs against confusion. The founders of Quince.com selected the name because it was short for "quintessentials," and it was "elegant, unfettered, and concise," similar to the products sold on Quince.com. Gupta Decl. ¶ 6. They had no intent to create any confusion with Plaintiff. Plaintiff's business model of charging high prices for elaborate meals is antithetical to Quince.com's mission of making essentials at affordable prices. It would have been oxymoronic for Quince.com to attempt to create confusion with a business that has a conflicting business paradigm. *Id.* ¶ 7. And, in fact, Plaintiff's restaurant was closed when Quince.com launched its business. Briers Decl. ¶ 4.

Plaintiff contends that the name of Quince.com's CEO, Sid Gupta, appears on its reservation log from 2015, five years prior to the launch of Quince.com. Mot. 20. Mr. Gupta has eaten at Plaintiff's other restaurant, called "Cotogna," and he was aware of the restaurant Quince. But he has no recollection of ever eating there. Gupta Decl. ¶ 8. In any event, Plaintiff's argument is immaterial since "knowledge of another's goods is not the same as an intent to mislead and to cause customer confusion." *Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*, 143 F. Supp. 3d 947, 957 (N.D. Cal. 2015); *see also JIPC Mgmt., Inc. v. Incredible Pizza Co., Inc.*, 2008 WL 11336396, at *22 (C.D. Cal. Aug. 26, 2008); *McCarthy* 23:115 (collecting cases). Plaintiff's focus on a single marketing email Defendant sent in January 2024 (Mot. 10) also is irrelevant to the question of why Quince.com adopted its name in June 2020. In any event, when Plaintiff raised its concern about Quince.com's marketing email, Quince.com immediately ceased using the term "Michelin" to advertise its cookware products, belying any suggestion of intentionality. Gupta Decl. ¶ 12.

Lastly, Plaintiff copied Quince.com's logo, not the other way around. Briers Decl. ¶¶ 13–15. To the extent the marks' nearly identical font suggests one party deliberately adopted another's mark "to obtain some advantage," *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157–58 (9th Cir. 1963), it is clear that Plaintiff is the party with culpable intent, not Defendant.

### (i)    Likelihood of Expansion: There Is No Risk of Expansion.

Quince.com has no intent to expand into restaurant or catering services, Gupta Decl. ¶ 13, and Plaintiff does not submit any evidence, or advance any argument, that it intends to expand into the sale of apparel or any other consumer goods. While Plaintiff contends it has endorsed Mr. Noel's handmade chef knife, it does not profess any intent to expand into the sale of any other cookware.[9] By staying silent on its own likelihood of expansion, Plaintiff concedes that the relevant zone of expansion—its own—is nonexistent. *See Surfvivor Media*, 406 F.3d at 634 ("[W]e must determine whether existence of the allegedly infringing mark is hindering *the plaintiff's* expansion plans." (emphasis added)). "[Plaintiff's] complete inability to adduce any concrete evidence of expansion plans tilts this factor in favor of [Quince.com]." *Id.*

On balance, the *Sleekcraft* factors weigh heavily against a likelihood of consumer confusion.

### B.    Plaintiff Will Not Suffer Irreparable Harm Without a Preliminary Injunction.

Plaintiff leans heavily on the "rebuttable presumption" that arises when there is a "finding of likelihood of success on the merits." Mot. 21 (quoting 15 U.S.C. § 1116(a)). That presumption is rebutted when the defendant makes even a "slight evidentiary showing" that the plaintiff will not suffer irreparable harm, after which the presumption "disappears like a bursting bubble." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 186 (3d Cir. 2022). The burden then shifts back to the plaintiff to prove "actual" irreparable harm that is "likely," and not just a "possibility." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). Plaintiff also must "establish that remedies available at law, such as monetary damages, are inadequate to compensate for the injury arising from" the putative trademark infringement. *Id.*

---

[9] Plaintiff incorrectly contends that Defendant "launched its cookware line . . . after this lawsuit was filed." Mot. 21. Quince.com launched its first chef's knife—the only product Plaintiff contends is overlapping between the parties—two years ago, in February 2022. Milligan Decl. ¶ 6. In any event, Plaintiff's argument is irrelevant to this factor because, to the extent the parties already sell a common product, the expansion "factor is unimportant." *Network Automation*, 638 F.3d at 1153.

Quince.com easily rebuts the presumption here. The limited inconveniences Plaintiff identified—namely, misdirected packages and online reviews—are not evidence of irreparable harm and were *already* remedied. Plaintiff delayed in filing suit and bringing this motion, waiting nearly four years after Defendant began using its "Quince" mark and 17 months after it alleges it first identified confusion. This delay itself is evidence that irreparable harm does not exist. *Oakland Trib., Inc. v. Chron. Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). And, Plaintiff already has offered to license its trademark to Quince.com for a monetary payment, demonstrating that, even in its own eyes, any harm can be resolved through damages.

**1.      The Purported Confusion Plaintiff Identified Does Not Demonstrate Irreparable Harm and Already Has Been Remedied.**

The only evidence Plaintiff points to as demonstrating irreparable harm is a "negative Yelp review" and "five [BBB] complaints." Mot. 28. But even if "there may be confusion in the minds of the public," it is still incumbent upon Plaintiff to "show how this confusion is causing it any actual or potential harm." *Kahala Franchising, LLC v. Real Faith, LLC*, 2022 WL 1605377, at *4 (C.D. Cal. May 20, 2022). Plaintiff's conclusory assertion does not clear that hurdle.

"Mere customer confusion, on its own, cannot constitute irreparable harm." *Vital Pharms., Inc. v. PhD Mktg., Inc.*, 2020 WL 6545995, at *7 (C.D. Cal. Nov. 6, 2020). This case is similar to the situation addressed by the Ninth Circuit in *Herb Reed,* where the plaintiff pointed to an email from a confused consumer. 736 F.3d at 1249. The Ninth Circuit held that this evidence "simply underscores customer confusion, not irreparable harm," and was insufficient to support issuance of a preliminary injunction. *Id.* at 1250. The same conclusion was reached in the *Vital* case, which addressed an energy drink company's contention that it suffered reputational damage based on complaints from customers of an e-cigarette company with the same name. 2020 WL 6545995 at *7. The court explained that "the dissatisfaction of these customers with the e-cigarettes. . . is of no moment to Plaintiffs. Because Plaintiffs' reputation is premised on its sales of energy drinks, not e-cigarettes, the Court cannot infer that customer dissatisfaction with e-cigarettes establishes a likelihood of irreparable harm if an injunction does not issue." *Id.* at *8. Similarly, as a brick-and-

mortar restaurant, Plaintiff cannot show irreparable harm to its business based on customers' dissatisfaction with the sweaters or rugs purchased from Quince.com, an online retailer.

Plaintiff's reliance on past instances of miscategorized reviews mistakes that "[t]he purpose of a preliminary injunction is to prevent future harm, not to remedy past harm." *The Real USFL, LLC v. Fox Sports, Inc.*, 2022 WL 1134487, at *10 (C.D. Cal. Apr. 14, 2022). The errant reviews have *already* been remedied, and cannot support the award of injunctive relief. *BrightView Landscapes, LLC v. Stowell*, 2017 WL 10511569, at *2 (C.D. Cal. Dec. 11, 2017) (Plaintiff had not "made a 'clear showing' that the threatened harm it perceives to its goodwill and loss of customers is immediate (because it has already occurred) and irreparable (because it can be quantified).").

**2.      Plaintiff's Long Delay Demonstrates Lack of Irreparable Harm.**

Plaintiff's delay in seeking a preliminary injunction "implies a lack of urgency and irreparable harm." *Cuviello*, 944 F.3d at 833. "[A]lthough a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Ctr. for Food Safety v. Schafer*, 2010 WL 964017, at *4 (N.D. Cal. Mar. 16, 2010). Plaintiff is keenly aware of the consequences of its delay, and in an effort to avoid that fate has mischaracterized the parties' interactions and pointed to inapt case law. *See* Mot. 22–23.

Defendant began using its "Quince" mark in June 2020, nearly four years before Plaintiff filed this motion. Plaintiff claims it first became aware of purported confusion in September 2022, more than 17 months prior to filing this motion. *See* Tusk Decl. ¶ 19. Three months passed without action. Plaintiff then sent a letter to Quince.com on December 21, 2022. *See* ECF No. 9-1 ("Brooks Decl.") ¶ 4, Ex. 1. Quince.com sent a response on January 23, 2023, which identified the weakness of Plaintiff's common law mark, summarized the *Sleekcraft* factors, and concluded that the matter had been "put to rest." *Id.* ¶ 5, Ex. 2. Plaintiff sent a follow-up letter on February 9, 2023, to which Quince.com did not respond because, in its view, its prior response was clear. *Id.* ¶ 6.

Plaintiff allowed *seven months* to pass without any correspondence or interaction between the parties. During this time, Plaintiff, likely realizing the weakness of its claims, sought out a registered trademark it might acquire to brandish. Plaintiff's letter dated September 14, 2023, did

just that—boasting a newly acquired trademark registration. Brooks Decl. ¶ 10. After counsel spoke on October 6, 2023, another six weeks passed with no activity. Then, on November 21, 2023, Plaintiff finally filed, but did not serve, its complaint. *Id.* ¶¶ 11–12.

Plaintiff's counsel attempts to explain away the additional *four-month* delay between the October 6, 2023, phone call and Plaintiff's service of the complaint on February 5, 2024, by vaguely asserting that "[b]etween November 2023 and January 2024, I continued having settlement discussions with Defendant's counsel." *Id.* ¶ 13. In actuality, this latest delay was also riddled with a lack of urgency. The parties had a call scheduled for December 11, 2023, which was *cancelled* by Plaintiff's counsel because she "d[id]n't have an update for [Defendant's counsel] from [her] client." Briers Decl. ¶ 20, Ex. N. Counsel connected on December 13, 2023, and there was no resolution to the matter. *Id.* Another month passed before Plaintiff's counsel emailed again, on January 11, 2024, to demand that Quince.com pay $12 million for a license. *Id.* ¶ 21, Ex. O. That communication stated "if we don't hear from you within the next 7 days, we intend to serve the complaint." *Id.* Quince.com did not respond within 7 days, but Plaintiff still did not serve the complaint. On January 19, 2024, Quince.com sent a response rejecting Plaintiff's demand, which stated that Quince.com looked forward to litigating the matter and prevailing. *Id*. Plaintiff *still* did not serve the complaint for another 17 days, followed by its preliminary injunction motion.

This is not the type of urgency required to justify the extraordinary remedy of a preliminary injunction, nor is it the type of "extensive settlement negotiations" suggested in Plaintiff's papers. Plaintiff's cited case law is either inapposite, or Plaintiff has obscured the other circumstances in those cases which explained minimal delay.[10] Even if Plaintiff had moved for a preliminary injunction in November 2023 when it filed its complaint (rather than waiting until February 2024),

---

[10] *See, e.g., UV RML NL Assets, LLC v. Coulter Ventures, LLC*, 2021 WL 5706870, at *12 (C.D. Cal. Oct. 22, 2021) (court referenced "extensive settlement negotiations." that parties were engaged in multiple parallel proceedings, defendant offered to adopt plaintiff's preferred terms, and parties exchanged drafts of settlement agreement); *Ocean Garden, Inc. v. Marktrade Co.,* 953 F.2d 500, 508 (9th Cir. 1991) (complaint filed same month as first instance of infringement, delay in moving for injunction largely explained by defendant's request for extensions); *Boldface Licensing + Branding v. Lee Tillett, Inc.,* 940 F. Supp. 2d 1178, 1197 (C.D. Cal. 2013) (first infringement in June 2012, lawsuit filed in November 2012, only 3 days after conclusion of settlement talks); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (settlement negotiations only covered late February to early March 2010; the delay for "nearly all" of 2010 after March was due to adjudication of defendant's meritless personal jurisdiction motion to dismiss).

the delay still would have weighed against a finding of irreparable harm. *See, e.g.*, *The Real USFL*, 2022 WL 1134487, at *11 (9-month delay weighed against irreparable harm, notwithstanding "'ongoing conversations' with Defendants in order to resolve the matter"); *Kerr Corp. v. N. Am. Dental Wholesalers, Inc.*, 2011 WL 2269991, at *3 (C.D. Cal. June 9, 2011) (5-month delay weighed against irreparable harm, despite claim of "'diligently' working to resolve the matter through conversations"); *Vital*, 2020 WL 6545995, at *8 (2-month delay "weighs against irreparable harm").[11] Plaintiff's intermittent outreaches to Quince.com during the 17-month period before moving for a preliminary injunction do not demonstrate that the requisite urgency exists.

### 3. Any Harm Claimed by Plaintiff Is Compensable in Monetary Damages.

Plaintiff cannot deny that the purported harm it has identified can be addressed by monetary damages. *See Herb Reed*, 736 F.3d at 1250 (plaintiff must "establish that remedies available at law, such as monetary damages, are inadequate to compensate for the injury"). Plaintiff's assertion of irreparable harm is disproved by its offer to grant a license to Quince.com in return for a payment $12 million. Briers Decl. ¶ 21, Ex. O. In fact, in offering to grant this "license" to Quince.com, Plaintiff explained that, while this is "a large sum of money," it would be sufficient "to compensate [Plaintiff] for the ongoing confusion, misdirected packages . . . and other confusion we discussed." *Id.* Plaintiff thus already admitted that the harms it identified can be compensated in monetary damages. In analogous situations, "when a patentee demonstrates a willingness to license patented technology," that cuts "against finding irreparable harm because the [plaintiff] has shown itself 'willing to forgo its [intellectual property] rights for compensation,'" such that any injury suffered "would be compensable in damages." *Finjan, Inc. v. Blue Coat Sys., LLC*, 2016 WL 6873541, at *7 (N.D. Cal. Nov. 22, 2016).

---

[11] *See also Globaltranz Enters. LLC v. Pinnacle Logistics Grp. LLC*, 2022 WL 1122158, at *3 (D. Ariz. Apr. 14, 2022) (finding 2-month delay too long); *Cocina Cultura LLC v. Oregon*, 2020 WL 7181584, at *4 (D. Or. Dec. 7, 2020) (finding 3-month delay too long)*; Manes v. City of Santa Ana*, 2023 WL 5504985, at *2 (C.D. Cal. July 12, 2023) (finding 10-month delay too long); *Escamilla v. Lara*, 2023 WL 8114962, at *8 (C.D. Cal. July 7, 2023) (finding 9-month delay too long); *Dobson v. Crawford*, 2023 WL 2347425, at *9 (C.D. Cal. Jan. 13, 2023) (denying preliminary injunction where plaintiff waited 2 months after filing complaint).

**C.    The Balance of Equities Weighs Strongly Against Issuing a Preliminary Injunction, Which Would Effectively Shut Down Defendant's Business.**

When balancing equities in a trademark case, "a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc*., 4 F.3d 819, 827 (9th Cir. 1993). In this case, the balance of equities tilts heavily against issuing the injunction, which would shut down Quince.com's operations—imperiling hundreds of jobs, hundreds of millions of dollars in annual sales, approximately ███ ████ in inventory, and more than ████████ already invested by Quince.com in marketing its brand—only to shield Plaintiff from the inconvenience of a few misdirected packages and reviews, which already have been remedied. Gupta Decl. ¶¶ 14–15; *see Atturo Tire Corp. v. Max-Trac Tire Co*., 2019 WL 1976446, at *6 (D. Nev. Mar. 7, 2019) (balance of equities favored defendant who expended millions marketing relevant mark, when compared to adverse effects on plaintiff).

Plaintiff's proposed injunction would be a death knell for Quince.com. The proposed injunction would require Quince.com to cease using the word "Quince" on any product, in any "internet domain," or to "market," "advertise," or "promote" any product sold on "Defendant's online retail store." ECF No. 9-4 at 6. It is not limited to the products Plaintiff contends both parties sell (*i.e.*, chef knives), but would extend to all of Quince.com's products, customers, and markets.

Entry of the proposed injunction would end Defendant's current business, which operates exclusively on Quince.com.[12] While Quince.com could make an effort to rebrand, it is doubtful it could survive the dramatic financial loss the injunction would impose: Quince.com would lose its investment of more than ████████ in marketing its brand, "Quince," along with the goodwill embodied in hundreds of thousands of third-party articles, posts, and reviews earned over nearly four years; and would need to reinvest a similar amount to obtain new customers, publicity, and name recognition. *See* Gupta Decl. ¶ 15. Rebranding would require Quince.com to shut down for several months to redesign its products and manufacture new inventory (since the ████████ in

---

[12] Plaintiff incorrectly argues that "transitioning to a new name would not be difficult" because Quince.com previously used the names "Last Brand" and "One Quince." Mot. 24. Plaintiff used the name "Last Brand" only during its "beta" test, which ended in March 2020. Gupta Decl. ¶¶ 4–5. Quince.com utilized the URL onequince.com for a short period of time while it was negotiating with the then-current owner of www.quince.com, but it has never marketed itself to consumers as "One Quince"—all of its marketing materials have consistently referred to it simply as Quince. *Id.* ¶ 9.

existing inventory would be forfeited), resulting in approximately ███████ in lost sales. Even once complete, the rebranded company would not have the same robust sales figures Quince.com currently enjoys—leading to hundreds of millions of dollars in lost revenue. *Id.*

The harms Plaintiff has identified (*i.e.*, several misrouted packages and misclassified reviews, which were already remedied) are slight in comparison to the existential threat to Quince.com's business. Courts regularly find that the hardship imposed by requiring a mature company to rebrand tips the balance of equities against a preliminary injunction. *See, e.g.*, *Kiva*, 402 F. Supp. 3d at 899 ("forcing [defendant] to undergo a massive rebranding of a name it has built up" through "product development, sales, brand recognition, and geographic expansion" weighed against preliminary injunction); *Champion-Cain v. MacDonald*, 2015 WL 4393303, at *12 (S.D. Cal. July 15, 2015). The severity of such an outcome drove Judge Walter in the Central District of California to deny a preliminary injunction that would prevent a new football league from using marks identical to another league's marks, notwithstanding that, unlike in this case, the defendants "deliberately decided to launch their new league using the same names and teams as the Old League in an apparent attempt to capitalize on the nostalgia for the Old League." *The Real USFL,* 2022 WL 1134487, at *10. The court rejected the notion that the injunction would "just require a name and jersey change," explaining that it "would effectively stop all of [the defendants'] activities while Defendants rebranded both the league and the teams, jeopardizing Defendants' investments and threatening the existence of the New League itself." *Id.* Such a result would be "plainly inequitable and extremely prejudicial to Defendants," such that the balance of equities "overwhelmingly favor[ed]" them. *Id.* at *12.

Plaintiff has not suffered any harm or inconvenience even approaching that which it seeks to inflict on Quince.com, an observation underscored by Plaintiff's delay in seeking this injunction.

### D. Plaintiff's Proposed Injunction Would Imperil Hundreds of Jobs and Third-Party Businesses, Harming the Public Interest.

Courts also "must consider the public interest as a factor in balancing the hardships." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). By triggering a shut-down of Quince.com, the proposed injunction would imperil hundreds of jobs. *See* Milligan Decl.

¶ 4. Third-party manufacturers who rely on Quince.com's business also would suffer, and Quince.com's investors would effectively forfeit more than ▮▮▮▮▮▮ invested in marketing the brand to consumers. *See id*. ¶¶ 3, 9; Gupta Decl. ¶¶ 14–15. These third parties' interests outweigh the *de minimis* evidence of purported confusion Plaintiff identified. For instance, in denying the preliminary injunction in *The Real USFL* case, the court acknowledged the "important public interest in minimizing consumer confusion," but that interest was dwarfed by the harm to third parties who had an economic interest in the league: the defendants' "numerous business partners" would "experience significant losses," "[p]layer and staff salaries and livelihoods would be at risk," the broadcaster "would lose substantial advertising revenue and be forced to modify its broadcasting schedules," which in turn would impact consumers. 2022 WL 1134487, at *12. This was an "unacceptable level of economic harm," and "weigh[ed] strongly against" the preliminary injunction. *Id.*; *see also Archive Corp. v. Cipher Data Prods., Inc.*, 1988 WL 168533, at *7 (C.D. Cal. Dec. 21, 1988) (harm to employees and manufacturers weighs against preliminary injunction).

**E.   A Bond Must Reflect the Significant Costs—Surpassing $200 Million—That Would Be Inflicted on Defendant by a Preliminary Injunction.**

In the event the Court issues a preliminary injunction, it should order Plaintiff to post a bond of at least $200 million. A court may issue a preliminary injunction "*only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c) (emphasis added). In trademark litigation, "[w]hen setting the amount of security, district courts should err on the high side" because a defendant will still have to prove actual losses such that "[a]n error in setting the bond too high" is "not serious." *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 888 (7th Cir.) (Easterbrook, J.).

Plaintiff seeks an injunction that would shutter a business generating more than ▮▮▮▮▮▮ in annual sales "on a mere probability of success on the merits, [and thus] must demonstrate confidence in [its] legal position by posting bond in an amount sufficient to protect [Defendant] from loss." *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982). "Among the factors that have been considered in determining the appropriate amount of a bond in a trademark infringement case are: (1) the profits that the enjoined party will lose during the period of the injunction, (2) out-of-pocket

expenses as to yet unreleased products and cancellation of current contracts, (3) expenses associated with the recall of any products now in the marketplace, and (4) damage to reputation and/or loss of good will." *Usrey v. Chen*, 2014 WL 12570232, at *9 n.16 (C.D. Cal. May 29, 2014).

Plaintiff's requested injunction would destroy Quince.com's hard-earned name recognition and goodwill with its customer base, which is a harm that is difficult to quantify. But other categories of damage are more readily quantifiable. Quince.com submitted a declaration from its CEO supporting the damage it would sustain if it is preliminarily enjoined during the pendency of this litigation, amounting to over $200 million. Gupta Decl. ¶¶ 14–15. This includes the lost sales, rebranding expenses, redesign costs, and lost inventory Quince.com would incur if it were required to stop using its web domain, Quince.com, and stop selling "Quince" branded products during the pendency of this case. The bond should be no less than these costs.

Plaintiff's pitch to the Court to allow it "to proceed without posting a bond at all" is meritless. The lone case Plaintiff cites (Mot. 25) is completely inapposite: that case reflects a unique example of a bond waiver "where impecunious public interest organizations s[ought] to enforce rights protected by the private attorney general clauses of statutes dealing with matters of public interest." *Michaels v. Internet Entm't Grp., Inc.,* 5 F. Supp. 2d 823, 842 (C.D. Cal. 1988) (citing *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985)). Plaintiff cannot avail itself of that exception here. And, more broadly, Plaintiff's effort to entirely avoid posting a bond appears to be another gambit to manufacture settlement leverage that is untethered from the perceived harm to its business. Plaintiff's instinct in this regard has not gone overlooked by courts: "Trademark suits, like much other commercial litigation, often are characterized by firms' desire to heap costs on their rivals, imposing marketplace losses out of proportion to the legal merits. That's why bonds must reflect full costs." *Mead*, 201 F.3d at 888.

## IV.    MOTION TO STRIKE PAGE DECLARATION

Defendant moves to strike the Declaration of Daniel Page (ECF No. 9-3) as not signed under penalty of perjury, violating 28 U.S.C. § 1746 and Civil L.R. 7-5. *See* Kwon Decl. ¶¶ 2–3.

## V.    CONCLUSION

For the reasons stated, the Court should deny Plaintiff's motion for a preliminary injunction.

DATED: February 20, 2024        MUNGER, TOLLES & OLSON LLP

By:   */s/ Zachary M. Briers*
      ZACHARY M. BRIERS
      ERIN J. COX
      ADAM W. KWON
      *Attorneys for Defendant Last Brand, Inc. d/b/a*
      *Quince.com*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2024, a true and correct copy of the foregoing document was served electronically, via ECF, on all counsel of record who are deemed to have consented to such service under the Court's local rules.

/s/ Zachary M. Briers
Zachary M. Briers